T.C. Memo. 2006-75

UNITED STATES TAX COURT

JAMES E. JENKINS AND RUTH A. JENKINS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10295-03.              Filed April 17, 2006.

<u>Thomas McKinney, Jr.</u>, for petitioners.*

<u>Martha J. Weber</u> and <u>Nancy Hale</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

FOLEY, <u>Judge</u>:  By notice of deficiency dated April 7, 2003,
respondent determined deficiencies in and additions to

---

*Following trial and the completion of the briefing process,
petitioners filed a Notice of Death of Counsel Thomas McKinney,
Jr.  As a result, the Court deemed Mr. McKinney withdrawn as
petitioners' counsel.

petitioners' 1994, 1995, 1996, and 1997 Federal income taxes. The issues for decision are whether petitioners received unreported income and are liable for the section 6663(a)[1] fraud penalty.

FINDINGS OF FACT

Petitioners married on April 14, 1990, and remained married from 1994 through 1997 (i.e., the years in issue). Prior to meeting Ruth A. Jenkins, James E. Jenkins (petitioner) made a modest living in the flea market business. Mrs. Jenkins was a successful businesswoman and sole owner of Salvage Brokers, Limited, Inc. (Salvage Brokers), an auction and salvage business. Petitioner and Mrs. Jenkins were president and secretary, respectively, of Salvage Brokers. During the years in issue, petitioners went on various gambling trips to Las Vegas, Nevada, and Tunica, Mississippi, would typically take $1,500 for gambling purposes, and had gambling losses in excess of their winnings.

Petitioner and Robert Hood were partners in ARJay Rentals (ARJay). Petitioner and Hood, through ARJay, assisted charities in organizing and operating bingo games. In exchange for their services, the charities agreed to lease building space in which to conduct the bingo games, purchase bingo equipment (e.g., bingo cards), and split a percentage of the net profits with petitioner and Hood. ARJay's receipt of a percentage of the net profits

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue.

violated Va. Code Ann. sec. 18.2-340.9 (1994) (i.e., prohibiting individuals, partnerships, and corporations from receiving "compensation * * * for the purpose of organizing, managing, or conducting bingo games") and constituted illegal gambling for purposes of 18 U.S.C. sec. 1955 (1994).[2]

From January 1994 to April of 1996, petitioner and Hood operated bingo games with the Jasper Volunteer Fire Department (JVFD) in Jasper, Virginia. In exchange for their services, petitioner and Hood received payments relating to the purchase and rental of bingo equipment and a percentage of profits. During 1994, 1995, and part of 1996, the games were generally held twice a week in a building owned by Mrs. Jenkins (Jasper property) and leased to ARJay for $500 per month. From 1994 to April of 1996, ARJay subleased the Jasper property to JVFD for $300 per night. In April of 1996, JVFD moved its bingo operations to another building owned by Mrs. Jenkins in Weber City, Virginia (Weber property). JVFD leased the Weber property from Mrs. Jenkins for $649 per night.

After each bingo session, petitioner, Hood, and certain members of JVFD would place all bingo proceeds on a table. The money used to provide change to patrons during the bingo sessions

---

[2] Illegal gambling is defined as the operation of a gambling business that: (1) Violates State law in which it is conducted; (2) involves five or more persons; and (3) occurs in excess of 30 days or has a gross revenue of $2,000 in any single day. 18 U.S.C. sec. 1955 (1994).

was counted first and removed from the table. After all the money was counted, the charities would generally issue checks to Mrs. Jenkins and ARJay for the rent and bingo equipment, respectively. On financial reports, generally prepared by petitioner, the attendance, expenses, and profits were reported. Hood deposited the rent checks issued to Mrs. Jenkins (i.e., by endorsing the checks in Mrs. Jenkins's name) and checks issued to ARJay into a bank account in the name of Robert C. Hood, d.b.a. ARJay Bingo Supplies (ARJay account). Both petitioner and Hood had signature authority over the ARJay account.

Petitioner and Hood operated bingo games with the East Carters Valley Ruritan Club (Ruritan Club) during 1994 and 1995. In exchange for their services, petitioner and Hood received payments relating to the purchase and rental of bingo equipment and a percentage of the profits. The bingo games were generally held twice a week at the Weber property. As with the Jasper property, ARJay leased the building from Mrs. Jenkins on a monthly basis for $500 and subleased it to the Ruritan Club for $489 per night. The Ruritan Club bingo games were conducted in the same manner as JVFD bingo games.

In 1996, the Ruritan Club terminated its affiliation with petitioner and Hood, ceased bingo operations at the Weber property, and moved its bingo operations to another building. That same year, one of its members, Kathy Babb, informed the

Virginia Gaming Commission that the JVFD was engaged in illegal bingo operations.

Beginning in February 1996, petitioner and Hood also operated bingo games with Handicaps Unlimited in Bristol, Virginia.  In exchange for their services, petitioner and Hood received payments relating to the purchase and rental of bingo equipment and a percentage of the profits.  The games were generally held twice a week.  Although the games were not held in one of Mrs. Jenkins's properties, they were conducted in the same manner as the JVFD and Ruritan bingo games.  In December of 1996, Handicaps Unlimited ceased operation of its bingo games.

On July 10, 1998, petitioners and Hood were indicted for illegal gambling, racketeering, and money laundering.  During petitioner's sentencing hearing, Hood testified that both he and petitioner had received substantial amounts of money from the bingo operations in addition to the income received relating to rent and supplies.  In exchange for his testimony, he avoided prison and received a 12-month sentence in a halfway house.

Petitioner pleaded guilty to the gambling and money laundering charges.  The remaining counts were dismissed against him, and all counts were dismissed against Mrs. Jenkins.  At his sentencing hearing, however, petitioner asserted that he did not receive any of the proceeds from the bingo games and received only payment for rent, supplies, and reimbursements for out-of-pocket expenses relating to the operation of the bingo games.

The court was unconvinced and sentenced petitioner to 60 months in prison and a fine of $100,000.

At the sentencing hearing, Agent David Gannaway, the primary Internal Revenue Service agent for this matter, testified regarding his investigation of the illegal gambling operations. He submitted a report consisting of a spreadsheet summarizing the figures used in the nightly financial reports prepared by petitioner. Relying on figures in the financial reports, he determined the amounts petitioner and Hood received from the bingo games operated from 1994 through 1997. He then computed the profit for petitioner and Hood based on what he concluded were the profit splits between the charities, petitioner, and Hood. For JVFD and the Ruritan Club, he concluded that petitioner and Hood's percentage of the proceeds was not fixed but varied from 40 percent to 70 percent based on attendance. He further concluded that petitioner and Hood's percentage of the proceeds relating to Handicaps Unlimited was 80 percent.

In the report, Agent Gannaway concluded, and Hood agreed, that petitioner and Hood received $1,181,560 from 1994 to 1997. This amount was reduced to $777,896 after deducting the amount he concluded that petitioner and Hood received for rent and supplies. Although Hood did not know if $777,896 was accurate, he requested that the Government reduce its determination of the net amount received to $700,000 and asserted that all proceeds were split evenly with petitioner. In response, the Government

ultimately concluded that petitioner and Hood each received $350,000.

Petitioners filed joint Federal income tax returns relating to 1994 through 1997, but failed to include income payments relating to rent and supplies from the charities. In 1999, petitioners filed amended returns relating to 1994 through 1997 to reflect the receipt of such income.

On April 7, 2003, respondent issued petitioners a notice of deficiency and determined deficiencies and penalties relating to 1994 through 1997 as follows:

| Year | Deficiency | Section 6663(a) penalty |
|------|-----------|-------------------------|
| 1994 | $38,853 | $29,140 |
| 1995 | 35,639 | 29,289 |
| 1996 | 22,047 | 21,020 |
| 1997 | 25,863 | 19,397 |

Respondent based his determinations on Hood's assertions, information received from various members of the respective charities, and Agent Gannaway's reconstruction of petitioners' income.

Petitioners resided in Kingsport, Tennessee, at the time they filed their petition with the Court.

### OPINION

In order for petitioners to be liable for the fraud penalty, an underpayment must exist. Parks v. Commissioner, 94 T.C. 654, 660-661 (1990). Respondent determined, pursuant to Agent Gannaway's report, that petitioners failed to report income

relating to the years in issue. Petitioner pleaded guilty to illegal gambling. Thus, respondent has linked petitioner with the income-producing activity. See Berlin v. Commissioner, 42 T.C. 355, 357 (1964). As a result, petitioners must prove, by a preponderance of the evidence, that respondent's deficiency determinations are arbitrary or unreasonable. Id.

On brief, respondent contends that he used the specific item method of proof for purposes of determining petitioners' unreported income. At trial, however, Agent Robin Britton, the agent who conducted the audit, stated that she "did not do a specific items" analysis and "basically [used Agent Gannaway's calculations] from the plea agreement". In response to the Court's inquiry regarding why she did not use an indirect method of proof (e.g., the net worth method), she stated that petitioners failed to provide her with the necessary records to utilize such a method. The Court then asked Agent Britton if she had requested such records from petitioners, and she admitted that she had not. Agent Britton also admitted that she failed to verify Agent Gannaway's report relating to the Ruritan Club by comparing his calculations with the Ruritan Club's deposit slips. With respect to JVFD and Handicaps Unlimited, she did not review the charities' financial reports or deposit slips for purposes of determining the accuracy of Agent Gannaway's report. Thus, for purposes of determining the amount of income petitioner and Hood received, respondent relied solely on Agent Gannaway's

calculations.  Agent Gannaway's report, however, is fatally flawed.

First, in determining the total amount received by petitioner, Agent Gannaway relied on information obtained from Hood.  Hood, the only witness testifying as to how much petitioner received, was not credible.  His testimony was self-serving and laden with prevarications.  In addition, for purposes of determining the profit percentages attributable to petitioner and Hood, Agent Gannaway relied on information obtained from certain members of the charities.  Although Agent Gannaway testified that the members were certain of the percentages petitioner and Hood received, at trial their testimonies contained numerous inconsistencies and, to varying degrees, were not credible.  We also note that some of those charity members were inappropriately receiving a portion of the bingo proceeds.  Furthermore, Agent Gannaway's report did not include corresponding deposit slips to support his calculations of approximately 40 entries (i.e., relating to Ruritan Club).  With respect to Handicaps Unlimited, the original financial reports were lost prior to trial, and no copies of such reports were proffered by respondent.  Thus, respondent's determinations are critically flawed, and virtually all the testimonial evidence was not credible.  As a result, the Court is required to accept respondent's incorrect determinations, recompute the

determinations (i.e., using unreliable records and testimony), or reject respondent's determinations.  We shall do the latter.

We also note that respondent did not utilize the net worth method for purposes of determining petitioners' unreported income but asserted that petitioners used the proceeds from the bingo games to support numerous gambling excursions.  The evidence, however, does not so establish.  Petitioners had sufficient funds from other sources (e.g., income from Salvage Brokers and substantial rental income received from the charities).

Petitioners have established, by a preponderance of the evidence, that respondent's determinations are incorrect.  Thus, we are compelled to reject the determinations.  Contentions we have not addressed are irrelevant, moot, or meritless.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for petitioners</u>.